UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WILLIAM GARVEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 08-342-B-W |
| | ) |
| INHABITANTS OF THE CITY OF BANGOR, | ) |
| et al., | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

William Garvey brought this civil action in state court complaining that on November 9, 2006, he was falsely arrested and imprisoned by the Bangor Police Department.  In addition to suing the Inhabitants of the City of Bangor, Garvey sues Detective Timothy Cotton and Detective Brent Beaulieu.  The arrest stemmed from a report to the Bangor Police Department by William Burgess that he was beaten and robbed by a man named "Jim" -- after they left the Hollywood Slots casino in downtown Bangor, Maine -- because Burgess refused to pay "Jim" for oral sex.

After removing the action to this court, the defendants now move for summary judgment. In his response Garvey concedes that there is no basis for a municipal liability/failure to train claim given the undisputed facts set forth by the defendants.[1]  Accordingly, the only claims remaining are those against the individual defendants, Detectives Cotton and Beaulieu. I now recommend that the Court grant the motion for summary judgment as to all the federal and state law claims.

---

[1]        (See Resp. Mot. Summ. J. at 11.)

## Discussion

**A.     Summary Judgment Standard**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant[s are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   I "draw the relevant facts from the summary judgment record and rehearse them in the light most flattering to" Garvey.   <u>Bergeron v. Cabral</u>, 560 F.3d 1, 4 (1st Cir. 2009)   (citing <u>Cox v. Hainey</u>, 391 F.3d 25, 27 (1st Cir.2004)).

With respect to Garvey's defense of this motion for summary judgment he makes a rather circular argument concerning the cognoscibility for summary judgment purposes of certain statements in the Cotton and Beaulieu affidavits concerning what other individuals told them, statements that contributed to their probable cause determination.  (<u>See</u> Resp. Mot. Summ. J. at 5-6.)  He asserts that the admissibility determination apropos this evidence must await trial.  I note these objections and address this challenge below. I add that, with regard to the summary judgment record,  the defendants are correct in identifying information relied on by Garvey in his memorandum that he has failed to set forth in his response to the defendants' statement of fact or in his statement of additional facts. (<u>See</u> Reply Mem. at 1-3.)  My recommendation is based on the factual statements contained in the parties' statements of fact.

**B.     Facts**

William Garvey has a ninth grade education and at the time of his arrest he was being treated for ADHD, anxiety, and mood disturbances. He has had mental health issues since childhood. (SAMF ¶149; Resp. SAMF ¶149.)

At all times relevant to this case, Ronald Gastia, was a supervisor by the City of Bangor

Police Department.  (SMF ¶ 1; Resp. SMF ¶ 1.)[2]   Brent Beaulieu, was employed as a detective

---

[2]     The facts relevant to the City's potential municipal liability, now not contested by Garvey, are as follows. Gastia has been Chief of Police of the Bangor Police Department since April, 2007. (SMF ¶ 2; Resp. SMF ¶ 2.) He is a graduate of the Maine Criminal Justice Academy and is certified to function as a police officer in the State of Maine by the Maine Criminal Justice Academy. (SMF ¶ 3; Resp. SMF ¶ 3.) Gastia is familiar with policies and procedures concerning arrest powers and the training given to Bangor police officers in this area. (SMF ¶ 4; Resp. SMF ¶ 4.)  Warrantless arrests, such as that of William Garvey by Detectives Cotton and Beaulieu on November 9, 2006, are also governed by state law. (SMF ¶ 5; Resp. SMF ¶ 5.)  Bangor police officers are trained in accordance with 17-A M.R.S.A. § 15, both at the Maine Criminal Justice Academy and at the Bangor Police Department, including their authority to make a warrantless arrest when an officer has probable cause to believe the arrestee has committed a Class A crime, such as the strong arm robbery for which Garvey was arrested. (SMF ¶ 6; Resp. SMF ¶ 6.)

The Bangor Police Department also has a policy prohibiting discrimination in the providing of police services to any individual based on sexual orientation. (SMF ¶ 7; Resp. SMF ¶ 7.)  Bangor police officers are trained on the Department's policy prohibiting discrimination in the providing of police services to any individual based on sexual orientation and the corollary state law on which it is based. (SMF ¶ 8; Resp. SMF ¶ 8.)   Included in the Bangor Police Department's policy governing prohibited conduct is a prohibition against an officer making statements that would be considered contemptuous, insolent, insulting, or provoking to a member of the public. (SMF ¶ 9; Resp. SMF ¶ 9.) Any statements by Bangor police officers that would defame a citizen would be a violation of the department's Prohibited Conduct policy and may also represent conduct unbecoming a Bangor police officer, for which they would be subject to possible discipline. (SMF ¶ 10; Resp. SMF ¶ 10.)
Before any police officer hired by the City of Bangor is allowed to patrol on his own, he/she must first graduate from the Maine Criminal Justice Academy and be certified by the State of Maine to perform the duties assigned to a patrol officer. (SMF ¶ 11; Resp. SMF ¶ 11.)  In addition to graduating from the Maine Criminal Justice Academy and being certified by the State of Maine, all new officers must complete a field training program with the Bangor Police Department. (SMF ¶ 12; Resp. SMF ¶ 12.)  The field training program is overseen by supervisory personnel at the Bangor Police Department and includes ongoing reviews of the officer's performance by those supervisors. (SMF ¶ 13; Resp. SMF ¶ 13.) It is only after the field training program is successfully completed that a newly-hired Bangor Police officer may work patrol duties on his own. (SMF ¶ 14; Resp. SMF ¶ 14.)   Included in the field training is a review of the Standard Operating Procedures of the Bangor Police Department, including the policies governing arrest and non-discrimination. (SMF ¶ 15; Resp. SMF ¶ 15.)  State and federal laws governing warrantless arrest and non-discrimination are also taught as part of the curriculum of the basic course at the Maine Criminal Justice Academy. (SMF ¶ 16; Resp. SMF ¶ 16.)  Police officers are also required to complete continuing education every year, as assigned by the state, in order to maintain their certification. (SMF ¶ 17; Resp. SMF ¶ 17.) Standard Operating Procedures of the Bangor Police Department are periodically reviewed with all officers. (SMF ¶ 18; Resp. SMF ¶ 18.)

Prior to November 9, 2006, Chief Gastia was not made aware of any problems that existed involving Detective Beaulieu and his knowledge of Maine's laws governing warrantless arrests, defamation and/or non-discrimination based on sexual orientation.  (SMF ¶ 33; Resp. SMF ¶ 33.)  Prior to November 9, 2006, Chief Gastia was not made aware of any problems that existed involving Detective Cotton and his knowledge of Maine's laws governing warrantless arrests, defamation and/or non-discrimination based on sexual orientation. (SMF ¶ 34; Resp. SMF ¶ 34.)  Prior to November 9, 2006, Chief Gastia had not received any credible information that Detective Beaulieu unlawfully exercised his arrest powers or discriminated against or disparaged others based on sexual orientation, or that there was a demonstrated need for additional training and/or supervision of Detective Beaulieu in those areas. (SMF ¶ 35; Resp. SMF ¶ 35.)  Prior to November 9, 2006, Chief Gastia had not received any credible information that Detective Cotton unlawfully exercised his arrest powers or discriminated against or disparaged others based on sexual orientation, or that there was a demonstrated need for additional training and/or supervision of Detective Cotton in those areas. (SMF ¶ 36; Resp. SMF ¶ 36.)  In addition, Chief Gastia had received no credible information indicating that there was any widespread problem with other Bangor police officers concerning these

with the City of Bangor Police Department. (SMF ¶ 22; Resp. SMF ¶ 22.)  Beaulieu is a graduate of the Maine Criminal Justice Academy and certified to function as a law enforcement officer in the State of Maine. (SMF ¶ 23; Resp. SMF ¶ 23.)  Beaulieu had completed a field training program with the Bangor Police Department prior to November 9, 2006. (SMF ¶ 24; Resp. SMF ¶ 24.)  Both at the Maine Criminal Justice Academy and through in-house training at the Bangor Police Department, Detective Beaulieu received training on arrest procedures, including warrantless arrests, and non-discrimination based on sexual orientation. (SMF ¶ 25; Resp. SMF ¶ 25.)  While employed at the Bangor Police Department Detective Beaulieu received training regarding all standard operating procedures and policies governing department police officers. (SMF ¶ 26; Resp. SMF ¶ 26.)   Detective Beaulieu's training has included proper arrest procedures and the probable cause analysis needed to support an arrest and warrantless arrest. (SMF ¶ 27; Resp. SMF ¶ 27.)

At all times relevant to this case, Timothy Cotton was employed as a detective with the City of Bangor Police Department. (SMF ¶ 28; Resp. SMF ¶ 28.)  Detective Cotton is a graduate of the Maine Criminal Justice Academy and certified to function as a law enforcement officer in the State of Maine. (SMF ¶ 29; Resp. SMF ¶ 29.)  Detective Cotton had completed a field training program with the Bangor Police Department prior to November 9, 2006. (SMF ¶ 30; Resp. SMF ¶ 30.)  Both at the Maine Criminal Justice Academy and through in-house training at the Bangor Police Department, Detective Cotton received training on arrest procedures,

---

areas of the law. (SMF ¶ 37; Resp. SMF ¶ 37.) In the ten year period preceding November 9, 2006, the Bangor Police Department had only received a few allegations of a person being arrested without probable cause which, upon investigation, were deemed to be unfounded. (SMF ¶ 38; Resp. SMF ¶ 38.)  During the ten year period preceding November 9, 2006, there have been no allegations of any Bangor police officers defaming a citizen based on his/her sexual orientation through statements about that orientation to a third party. (SMF ¶ 39; Resp. SMF ¶ 39.)

including warrantless arrests, and non-discrimination based on sexual orientation. (SMF ¶ 31; Resp. SMF ¶ 31.)  Detective Cotton's training has included proper arrest procedures and the probable cause analysis needed to support an arrest and warrantless arrest. (SMF ¶ 32; Resp. SMF ¶ 32.)

On October 20, 2006, at approximately 2:45 a.m., Detective Beaulieu was dispatched to the Irving Mainway on Main Street based on a report that a person had just been robbed in that area. (SMF ¶ 40; Resp. SMF ¶ 40.) On October 20, 2006, at approximately 2:45 a.m., Detective Cotton responded to the report of a strong-arm robbery in the area of Lower Main Street in Bangor. (SMF ¶ 41; Resp. SMF ¶ 41.)  Dispatch had broadcast a description of the suspect, who reportedly had been last seen walking down Main Street toward downtown Bangor.  (SMF ¶ 42; Resp. SMF ¶ 42.)   Detective Beaulieu went to the robbery victim's location at the Irving Mainway on Lower Main Street, looking for the suspect as he was enroute. (SMF ¶ 43; Resp. SMF ¶ 43.)    As Detective Beaulieu went to the robbery victim's location, Detective Cotton began to look for the suspect in the Lower Main Street area. (SMF ¶ 44; Resp. SMF ¶ 44.)

At the Irving Mainway, Detective Beaulieu met with the robbery victim, Wesley Burgess. (SMF ¶ 45; Resp. SMF ¶ 45.)   Mr. Burgess appeared intoxicated, and had red marks and blood on his neck and face and his clothing was in disarray and stained with dirt. (SMF ¶ 46; Resp. SMF ¶ 46.)   Detective Beaulieu told Detective Cotton that the victim was inebriated and appeared to have been assaulted. (SMF ¶ 47; Resp. SMF ¶ 47.)   Burgess advised Detective Beaulieu that the suspect had robbed him of $200 before fleeing toward downtown. (SMF ¶ 48; Resp. SMF ¶ 48.)   Burgess also advised Detective Beaulieu that Burgess and the suspect had been together at Hollywood Slots prior to the assault and robbery. (SMF ¶ 49; Resp. SMF ¶ 49.) Detective Beaulieu radioed the information that Burgess and the suspect had been together at

Hollywood slots prior to the assault and robbery to Detective Cotton. (SMF ¶ 50; Resp. SMF ¶ 50.)

Detective Cotton went to Hollywood Slots and spoke to security officer Phil Day, inquiring if he had seen the victim and the suspect leaving together around closing time. (SMF ¶ 51; Resp. SMF ¶ 51.)   Security officer Day advised Detective Cotton that two inebriated males were asked by security personnel to leave the facility at around 2:00 a.m. (SMF ¶ 52; Resp. SMF ¶ 52.)   The security officer advised Detective Cotton to speak to the security director during business hours the following day to obtain a copy of a surveillance tape showing the two males exiting the casino. (SMF ¶ 53; Resp. SMF ¶ 53.)   Detective Cotton subsequently called Detective Beaulieu to inquire if Burgess and the suspect had been asked to leave by security, because the security officer at Hollywood Slots remembered two men who had been told to leave the facility around closing time. (SMF ¶ 54; Resp. SMF ¶ 54.)

Detective Beaulieu confirmed with Burgess that he and the suspect had been asked to leave the facility by security personnel. (SMF ¶ 55; Resp. SMF ¶ 55.)   Burgess reported to Detective Beaulieu that he had been attacked after leaving Hollywood Slots, near the Anah Temple Shrine on Main Street. (SMF ¶ 56; Resp. SMF ¶ 56.)

Detective Beaulieu then transported Burgess to the Bangor Police Station to obtain a detailed account of the events leading up to the assault and robbery. (SMF ¶ 57; Resp. SMF ¶ 57.)  Mr. Burgess advised Detective Beaulieu that he went to The Tavern at approximately 9:30 p.m. and had met a man while smoking outside the bar who introduced himself only as "Jim." (SMF ¶ 58; Resp. SMF ¶ 58.)  The two men began talking about Hollywood Slots, with "Jim" telling Burgess that he had never been there. (SMF ¶ 59; Resp. SMF ¶ 59.)  When Burgess

indicated that he was heading to Hollywood Slots, "Jim" decided to go with him and the two men walked to the casino from The Tavern. (SMF ¶ 60; Resp. SMF ¶ 60.)

After the two men gambled for some time, at approximately 2:00 a.m. "Jim" was asked to leave the casino because he was intoxicated. (SMF ¶ 61; Resp. SMF ¶ 61.)  Although Burgess denied drinking after he left The Tavern, Burgess appeared to be intoxicated to Detective Beaulieu as well. (SMF ¶ 62; Resp. SMF ¶ 62.)  Burgess did admit to Detective Beaulieu to having consumed six pints of beer while at The Tavern. (SMF ¶ 63; Resp. SMF ¶ 63.)  At first, Burgess told Detective Beaulieu that he and "Jim" had gone from the casino to the Irving Mainway to buy beer, but wavered on that point when Detective Beaulieu advised him that beer sales stop at 1:00 a.m., and stated that they had purchased cigarettes. (SMF ¶ 64; Resp. SMF ¶ 64.) Upon some prodding by Detective Beaulieu concerning details of the men's actions after leaving Hollywood Slots, Burgess confessed that he and "Jim" had "gotten a little intimate." (SMF ¶ 65; Resp. SMF ¶ 65.) At this point, Burgess got upset and asked to be taken home, but relented and, after a few minutes break, he said he was ready to relate what really happened. (SMF ¶ 66; Resp. SMF ¶ 66.)

Detective Cotton returned to the police station and spoke briefly with Detective Beaulieu who was interviewing the robbery victim. (SMF ¶ 67; Resp. SMF ¶ 67.)  During the break, Detective Beaulieu indicated to Detective Cotton that some of the victim's statements seemed inconsistent and it appeared at that time that Burgess and the suspect had some type of sexual contact prior to the alleged assault. (SMF ¶ 68; Resp. SMF ¶ 68.)  Detective Cotton returned to the interview room with Detective Beaulieu to assist in Burgess's interview.  (SMF ¶ 69; Resp. SMF ¶ 69.)   Burgess stated that the two men had gone behind Anah Temple Shrine for the purpose of having oral sex. (SMF ¶ 70; Resp. SMF ¶ 70.)  Detectives Beaulieu and Cotton

7

learned from Burgess that he had received oral sex from the robbery suspect, "Jim," prior to the robbery. (SMF ¶ 71; Resp. SMF ¶ 71.)   After the sexual act was performed, the suspect demanded money and then assaulted Burgess, kicking him in the head. (SMF ¶ 72; Resp. SMF ¶ 72.)  Burgess gave his assailant the cash that was in his pocket but the suspect demanded that Burgess turn over his wallet too. (SMF ¶ 73; Resp. SMF ¶ 73.)  Burgess said "Jim" punched him and choked him into unconsciousness, before taking Burgess's wallet from him and removing the money. (SMF ¶ 74; Resp. SMF ¶ 74.)   Burgess claimed that he then punched "Jim" several times before running off, leaving "Jim" behind the Shrine building. (SMF ¶ 75; Resp. SMF ¶ 75.)  Burgess reported to the detectives that he then went to the Irving to call the police. (SMF ¶ 76; Resp. SMF ¶ 76.)

Detectives Beaulieu and Cotton took Burgess back to the place where he claimed he was assaulted.  (SMF ¶ 77; Resp. SMF ¶ 77.) Detectives Beaulieu and Cotton saw physical evidence that a struggle had taken place there and located Burgess's hat there as well. (SMF ¶ 78; Resp. SMF ¶ 78.)  Burgess was adamant that he had never promised to pay "Jim" for oral sex and that it was supposed to be a "freebie." (SMF ¶ 79; Resp. SMF ¶ 79.)[3]

Later on the morning of October 20, 2006, Detectives Beaulieu and Cotton obtained a photograph that was made from a Hollywood Slots surveillance camera, showing the robbery suspect exiting the casino. (SMF ¶ 82; Resp. SMF ¶ 82.) Because Burgess advised Detective Beaulieu that he had first met the robbery suspect at The Tavern on Main Street, and proceeded from there to Hollywood Slots in his company, Detectives Beaulieu and Cotton then went to The Tavern and interviewed the bartender from the night before, Cindy Moulton. (SMF ¶ 83; Resp.

---

[3]        At that point, Burgess claimed to have pain in his left rib area and Detectives Beaulieu and Cotton drove him to Eastern Maine Medical Center to be evaluated. (SMF ¶ 80; Resp. SMF ¶ 80.)  Detectives Beaulieu and Cotton left Burgess at EMMC waiting to be seen for his complaints. (SMF ¶ 81; Resp. SMF ¶ 81.)

SMF ¶ 83.)  Ms. Moulton looked at the Hollywood Slots photograph and confirmed that the

individual shown in it had been drinking at The Tavern the previous night. (SMF ¶ 84; Resp.

SMF ¶ 84.)

Based on the information from Mr. Burgess and Ms. Moulton, Detectives Beaulieu and

Cotton believed the robbery suspect was the man shown in the Hollywood Slots photograph.

(SMF ¶85; Beaulieu Aff.  ¶5;  Cotton Aff. ¶4.) Bangor police officer Myron Warner viewed the

photograph that Detectives Beaulieu and Cotton had obtained from Hollywood Slots and advised

that he believed the photograph was of William Garvey, a person known to him, and who had an

extensive criminal record. (SMF ¶ 86; Beaulieu Aff. ¶6 ; Cotton Aff. ¶5.) Garvey knows Officer

Warner. (SMF ¶ 87; Resp. SMF ¶ 87.)  Garvey does not contest that his criminal record has 77

entries on it.  (SMF ¶ 88; Resp. SMF ¶ 88.) Officer Warner indicated he had recently had a

conversation with Garvey and the suspect in the photograph appeared to be Garvey. (SMF ¶ 89;

Beaulieu Aff.  ¶6; Cotton Aff. ¶5.)[4]

Detective Beaulieu obtained a photograph of Garvey from the Penobscot County Jail that

showed him wearing his hair in a ponytail. (SMF ¶ 90; Resp. SMF ¶ 90.)  Officer Warner

advised Detectives Beaulieu and Cotton that Garvey was no longer wearing his hair in a ponytail,

however, and his hairstyle now was the same as that of the robbery suspect in the photograph.

(SMF ¶ 91; Resp. SMF ¶ 91.)

 On November 7, 2006, Detectives Beaulieu and Cotton interviewed William Garvey at a

private residence in Bangor. (SMF ¶ 92; Resp. SMF ¶ 92.)   Detectives Beaulieu and Cotton

asked Garvey to speak with them outside of the residence for his own privacy. (SMF ¶ 93; Resp.

---

[4]      Garvey requests that the Court strike Paragraphs 85, 86, and 89 on the grounds that they are based on
hearsay.  (Resp. SMF ¶ 85, 86, 89.)

9

SMF ¶ 93.)  When told about the crime Detectives Beaulieu and Cotton were investigating, Garvey denied ever going to Hollywood Slots, saying that it would be a violation of his probation. (SMF ¶ 94; Resp. SMF ¶ 94; SAMF ¶ 151; Resp. SAMF ¶ 151.)  When shown the Hollywood Slots photograph of the suspect, Garvey angrily denied that he was the person in the photograph. (SMF ¶ 95; Resp. SMF ¶ 95.)  Garvey describes the officers as being argumentative with Garvey in the face of his continuing denials that he was the person in the picture.  (SAMF ¶157; T. Garvey Aff. ¶ 5.)[5]

Garvey also advised Detectives Beaulieu and Cotton that he had been spending nights in his vehicle in a parking garage that was only a short distance from the scene of the robbery, including being there the night of October 20, 2006. (SMF ¶ 96; Resp. SMF ¶ 96; Resp. SAMF ¶ 152.)  Garvey maintains that he told the officers that he could not be the individual he was seeking because he was homeless and sleeping in a truck.  (SAMF ¶ 152; W. Garvey Aff. ¶ 5.)

Because the suspect was wearing a leather jacket in the photograph, Detectives Beaulieu and Cotton asked Garvey if he had a leather jacket. (SMF ¶ 97; Resp. SMF ¶ 97.)   Garvey produced a leather jacket that appeared very similar to the one worn by the suspect in the Hollywood Slots photograph. (SMF ¶ 98; Resp. SMF ¶ 98.)   Garvey's jacket had an American flag pin on it, and some type of pin could also be seen in the same area on the suspect's leather jacket in the photograph. (SMF ¶ 99; Resp. SMF ¶ 99.)   The interview was then concluded with Garvey becoming very agitated and screaming at Detectives Beaulieu and Cotton. (SMF ¶ 100; Resp. SMF ¶ 100.)  The Police Officers went to talk to his probation officer and they would be back.  (SAMF ¶ 157; Resp. SAMF ¶ 157.)

---

[5]     The defendants deny that they argued with Garvey.  (Resp. SAMF ¶157.)

According to Garvey, on November 7, 2006, Tracy Garvey awoke to some noise downstairs. She saw two people who identified themselves as Bangor Police Detectives. The detectives had a picture of a man they believed was William Garvey.  Tracy looked at the picture and indicated that it was not William. She explained that the individual in the photo appeared to have an indentation on his face and William Garvey did not. She pointed out the indentation to the detectives. They appeared to ignore what she said. (SAMF ¶ 150; T. Garvey Aff. ¶ 3.) Tracy continued to state that William wasn't the person in the picture.  (SAMF ¶147; T. Garvey Aff. ¶ 157.)  Tracy recalls the detectives saying that William Garvey had done something wrong on October 20, 2006. She told them that he could not have because he was with her all night in the Downtown parking garage and maintains that she would have known if Garvey had exited the truck that night because of the cold. (SAMF ¶153; T. Garvey Aff.  ¶ 4; id. Ex. 1.)

The defendants deny that this interaction between the detectives and Tracy occurred, insisting that when Detectives Cotton and Beaulieu spoke to Garvey they did so outside the residence so that Ms. Garvey would not hear what they were discussing with her husband. The detectives did not interview Tracy or receive any information about her husband or any possible role he may have had in the assault and robbery they were investigating. The detectives did not show Tracy the photograph or ask her about it. The detectives received no information from Tracy on November 7, 2006, concerning her husband or the crime they were investigating. (Resp. SAMF ¶¶ 150, 153, 157;  Suppl. Beaulieu Aff. ¶ 1; Suppl. Cotton Aff. ¶ 1.)

After the detectives had left Mr. Garvey became very nervous and said he was scared to go back to prison. Garvey had been doing very well, keeping clean from drugs; he had been clean since March of 2006.  (SAMF ¶158; Resp. SAMF ¶ 158.)

11

Detective Beaulieu obtained a photographic lineup from Sergeant Rose Manette of the Penobscot County Sheriff's Office. (SMF ¶ 101; Resp. SMF ¶ 101.)   The lineup consisted of six photographs, including a photograph of Mr. Garvey.  (SMF ¶ 102; Resp. SMF ¶ 102.) On November 8, 2006, Detectives Beaulieu and Cotton met with the robbery victim, Wesley Burgess. (SMF ¶ 103; Resp. SMF ¶ 103.)  Burgess was told that he would be shown a photo lineup and that he should identify any person he recognized. (SMF ¶ 104; Resp. SMF ¶ 104.) Burgess pointed to the photograph of Garvey and positively identified Garvey as the person who had robbed and assaulted him. (SMF ¶105; Beaulieu Aff. ¶8; Cotton Aff. ¶7; Garvey Dep. at 31 - 32.) On the line-up card, there is a space that is labeled "NOTES," in which a person is instructed to state how, where, or when they first saw or met the person they are identifying in the line-up. (SMF ¶ 106; Resp. SMF ¶ 106.)   In that section of the line-up card, Mr. Burgess wrote "rolled me," indicating that Garvey was the person who robbed him.  (SMF ¶ 107; Beaulieu Aff. ¶8; id. Ex. A; Cotton Aff. ¶7.)  Burgess was very emphatic in identifying Garvey from the photo line-up, showing no doubt whatsoever in his belief that Garvey was, in fact, the person who robbed and assaulted him. (SMF ¶108; Beaulieu Aff.  ¶8; Cotton Aff. ¶7.) [6] Garvey concedes that he was identified in a photo lineup by Burgess, the victim of the robbery, as the person who assaulted and robbed him. (SMF ¶¶ 100, 111; Resp. SMF ¶¶ 109, 111.)

On November 9, 2006, the day after Burgess identified Garvey from the photographic line-up, Detectives Beaulieu and Cotton placed Garvey under arrest for a Class A Robbery. (SMF ¶ 110; Resp. SMF ¶ 110.)

---

[6]     Garvey requests that the Court strike Paragraphs 105, 107, and 108 on the grounds that they are based on hearsay.  (Resp. SMF ¶¶ 105, 107, 108.)

Garvey does not dispute that based on all the evidence Detectives Beaulieu and Cotton had obtained, they felt strongly that probable cause existed to believe Garvey had assaulted and robbed Burgess when Burgess refused to pay Garvey after he performed oral sex on Burgess. (SMF ¶ 120; Resp. SMF ¶ 120.)   According to the defendants, the fact that Garvey was forced to live in his vehicle at the time also provided a motive for him to be involved in a theft of money. (SMF ¶ 121; Beaulieu Aff. ¶ 9; Cotton Aff. ¶8.)   Garvey responds that he was living in his vehicle because he was not allowed to live with his wife in subsidized housing due to his prior drug convictions.  (Resp. SMF ¶ 121; T. Garvey Aff. ¶7.)  He represents that he was awaiting alternative housing when his probation officer called him indicating they had located housing for Garvey with the goal of getting Garvey to voluntarily appear at the probation office so that they could arrest him.  (Resp. SMF ¶ 121; T. Garvey Aff. ¶ 7.) [7]

When Detectives Beaulieu and Cotton placed Garvey under arrest, he was at the Office of Probation and Parole.  (SMF ¶  122; Resp.SMF ¶ 122.) On this date, November 9, 2006, William Garvey met Tracy Garvey after work and said they needed to see his Probation Officer because he was going to get housing.[8]  The arrest took place at 2:00 pm and Garvey was charged with Class A Robbery.  (SAMF ¶160; Resp. SAMF ¶160; see also SMF ¶  124; Resp.SMF ¶ 124.)  Tracy took Garvey's lighter, wallet, and other personal belongings from him. Tracy walked out to the cruiser and gave William Garvey a hug.  Tracy's son was crying hysterically saying "Don't take my step dad, don't take my step dad."  (SAMF ¶ 161; Resp. SAMF ¶161.)  Tracy saw William in the cruiser and in her opinion he was quite distraught and depressed. (SAMF ¶162; T. Garvey Aff. ¶ 9; Resp. SAMF ¶162.)   The detectives asked Tracy for  Garvey's leather

---

[7]       It is somewhat ironic that Garvey relies on Tracy Garvey's affidavit as his record evidence for this denial given all the hearsay objections he has interjected in his response.

[8]       Because Garvey had a criminal record he was not supposed to be staying in Public  Housing.

jacket, and she went and got it for them out of Garvey's truck. (SAMF ¶ 163; Resp. SAMF ¶163.)

After being arrested, Garvey was transported from the Office of Probation and Parole to the Penobscot County Jail. (SMF ¶ 123; Resp.SMF ¶ 123.) Detective Cotton gave Tracy and the child a ride to her place of work. (SMF ¶ 125; Resp.SMF ¶ 125; SAMF ¶ 164; Resp. SAMF 164.)[9] Per Garvey, during the ride to collect Tracy's car at the Main St. McDonalds, Detective Cotton continued to tell her that he thought she was lying, that Garvey hadn't been with her and had committed a crime. She told him she didn't lie. Detective Cotton said if she lied, he would charge her with committing a crime. Tracy repeated that she wasn't lying. William, her son, and herself had been together, sleeping in Billy's truck on the night of October 19-20, 2006. (SAMF ¶165; T. Garvey Aff. ¶ 12. ) The defendants qualify as follows.  Tracy advised him that she did not think her husband had committed the crime for which he was arrested. Detective Cotton spoke to her briefly about being truthful when providing information about her husband, but he did not accuse her of lying, nor tell her she faced arrest for lying to him. Detective Cotton was concerned that Tracy was scared and intimidated by her husband, who had a history of violent behavior, including toward women with whom he was having a relationship. Detective Cotton suspected that Tracy would say anything that would help her husband with regard to the criminal charges he was facing and could not take any information she provided at face value. Tracy did tell Detective Cotton that she and her son had been sleeping with her husband some nights in his truck because Garvey was not allowed to sleep in her housing project due to his criminal history. But she could not provide Detective Cotton any reliable information about Garvey's whereabouts

---

[9]     She has a disability and is not able to drive William's truck. (SAMF ¶ 164.)

on the night of the crime. Given his knowledge of Garvey and his criminal history, Detective Cotton believed Tracy had ample reason to be afraid of her husband if he discovered she had cooperated with the investigation. (Resp. SAM ¶ 165;  Suppl. Cotton Aff. ¶ 2.)

Garvey maintains that a detective followed Tracy Garvey to her house to get a pair of hiking boots that Garvey had just bought. This detective came back again at about 4 pm asking for another leather jacket. Tracy informed them that William Garvey didn't have another leather jacket.  He only had one leather jacket and they had it.[10] The Bangor Police also said they wanted another pair of hiking boots. The detectives then looked through some clothing upstairs after Tracy had asked for them to wait for her company to come. She wanted to make certain there was a witness. Tracy describes the detectives as being very pushy, and finally Tracy was so scared she let them look. Tracy has never had a problem with the law and had never dealt with police and detectives. The detectives told her they were looking for a black shirt with white lettering. The detectives looked through William's clothes and then the detectives asked to see the rest of his clothes. Tracy told them those were all the clothes Garvey had left there. The detectives told her she was lying and that she was hiding something. She said "I was not." The police said "If you are, it is a crime and you'll go to jail, too." Tracy told them she was not lying and she had nothing to hide and neither did William. (SAMF ¶ 166; T. Garvey Aff. ¶ 14.)

According to the defendants Detectives Beaulieu and Cotton  met with Tracy at her residence to retrieve Garvey's leather jacket and to examine some hiking boots to see if they matched the ones worn by the suspect in the Hollywood Slots photograph.  (SMF ¶126; Beaulieu Aff. ¶10; Cotton Aff. ¶ 9.)   Only Detective Cotton went to the residence to retrieve the boots

---

[10]       (Resp. SMF ¶ 126; T. Garvey Aff. ¶¶ 10, 14.)

from Ms. Garvey.  (Resp. SAMF ¶ 166; Suppl. Beaulieu Aff. ¶ 2; Suppl. Cotton Aff. ¶ 3.)   The

defendants admit that they returned to Tracy's residence later that day and were given permission

by her to look at some clothing that Garvey had left there. The detectives did not remove any

items of clothing from the residence. Tracy advised the detectives that Garvey did not have a lot

of clothes at her residence because he was not allowed to live there. Neither detective accused

Tracy of lying or threatened her with arrest for lying.  (Resp. SAMF ¶ 166; Suppl. Beaulieu Aff.

¶ 3; Suppl. Cotton Aff. ¶ 3.)

A day or two following Garvey's arrest, Tracy came to the Bangor Police Station, asking

to speak to the detectives who were involved in the arrest. *(SMF ¶127; Cotton Aff. ¶ 9.)* It is

Garvey's contention that Tracy went to the police department at the request of the detectives.

(Resp. SMF ¶ 127; T. Garvey Aff. ¶15; id. Ex. 2; SAMF ¶168.)    The defendants deny that they

asked Tracy to come to the police station, indicating that she arrived without notice. (Resp.

SAMF ¶ 168.)  Detective Beaulieu was not present when Tracy came to the police station a day

or two after Garvey's arrest. (SMF ¶ 128; Resp. SMF ¶ 128.) Detective Cotton spoke with Tracy,

who was accompanied by her young child and another adult female. (SMF ¶ 129; Resp. SMF ¶

129.)  There was a brief discussion about the background of the case against Garvey, including

the homosexual sex act that preceded the assault on Burgess.  (SMF ¶ 130; Resp. SMF ¶ 130;

Resp. SAMF ¶ 5.)  Detective Cotton tried to be circumspect in his language because of the

presence of the young child. (SMF ¶ 131; Resp. SMF ¶ 131.) According to the defendants,

Detective Cotton asked Tracy if her husband had exhibited any gay tendencies or disclosed any

sexual interest in other males to her in the past. (SMF ¶132; Cotton Aff. ¶ 9; Resp SAMF ¶168.)

According to Garvey, Detective Cotton stated that Garvey had "gay tendencies."  (Resp. SMF ¶

132; T. Garvey Aff. ¶ 15; id. Ex. 2.)

Because the assault and robbery of Burgess followed his assailant's performing oral sex on him, such tendencies or interest on Garvey's part could have provided additional evidence in the case. (SMF ¶ 133; Resp. SMF ¶ 133.)   Tracy indicated she was not aware of Garvey having sexual interest in other males or exhibiting such tendencies. (SMF ¶ 134; Resp. SMF ¶ 134; Resp. SAMF ¶¶ 168, 169.)  To the extent Detective Cotton sought information from Tracy regarding whether Garvey exhibited any gay tendencies or showed a sexual interest in other males, it would certainly have been important evidence in the case. (SMF ¶ 135; Resp. SMF ¶ 135; Resp. SAMF ¶¶ 168, 169.)

Garvey insists that Detective Cotton said that she should be aware that Garvey has gay tendencies. Detective Cotton also said William had been seen frequenting downtown bars. Tracy stated that William had not been going to bars; Tracy stated she would have noticed the smell of alcohol on him. She told Detective Cotton she did not believe William Garvey was gay. (SAMF ¶169; T. Garvey Aff.  ¶ 16; W. Garvey Aff. ¶ 15.)  Garvey maintains that Detective Cotton said there was strong evidence against him. Detective Cotton told Tracy that Garvey had a criminal record and asked why she would want to hang around with someone like this. He told Tracy that William was guilty of domestic violence. Detective Cotton told Tracy that William was guilty of cruelty to animals and he said she should be scared to have him around her son. (SAMF ¶168; T. Garvey Aff. ¶ 15.)

According to the defendants, Detective Cotton did advise Tracy that her husband had a lengthy criminal record, including violent conduct toward women with whom he was in a relationship. Detective Cotton also advised Tracy that he was aware of her husband's conviction for cruelty to animals, for harming a pet rabbit of one of his girlfriends. Detective Cotton also briefly discussed with Tracy the information the detectives had received from Cindy Moulton,

the bartender at The Tavern, that her husband had been in that establishment on the night of the assault. That information had been received from Ms. Moulton when she was discussing the suspect in the Hollywood Slots video. (Resp. SAMF ¶¶ 168, 169; Suppl. Cotton Aff. ¶ 4.)

William Garvey called Tracy from jail and he was very upset. He was very depressed and he repeated to Tracy that it wasn't him. Tracy was extremely upset and so was her son. (SAMF ¶170; T. Garvey Aff. ¶ 17; Resp. SAMF ¶170.)[11]

On November 15, 2006, the bartender at The Tavern, Cindy Moulton, viewed the same photo line-up as was shown to Mr. Burgess. (SMF ¶ 136; Resp. SMF ¶ 136. ) Moulton identified William Garvey as someone she knew from her job at The Tavern, having seen him around the area of the downtown bars. (SMF ¶137; Beaulieu Aff. ¶ 11; Cotton Aff. ¶10.) Moulton further advised the detectives that Garvey had not been in The Tavern for some time because he had been banned from drinking at that establishment. (SMF ¶ 138; Beaulieu Aff. ¶11; Cotton Aff. ¶10.)[12] Because Moulton had identified the suspect in the Hollywood Slots photograph as a person she had served at The Tavern on the night of the robbery, but then provided information that the suspect she had served was not Garvey, who was also known to her, this information contradicted Burgess's identification of Garvey as the suspect shown in the Hollywood Slots photograph. (SMF ¶ 139; Resp. SMF ¶ 139.) Because of this contradictory information, Detectives Beaulieu and Cotton met with Assistant District Attorney Michael Roberts to provide him this new information and to secure Garvey's release from jail. (SMF ¶ 140; Resp. SMF ¶ 140.) Because Garvey was being held on a probation violation as a result of his arrest, Detectives Beaulieu and Cotton contacted his probation officer with the new information as well, so the

---

[11]   The defendants request that the representation by Tracy of what Garvey told his wife from jail be stricken on hearsay grounds and her characterization of his mental state as a medical diagnosis. (Resp. SAMF ¶ 170.)
[12]   Garvey requests that the Court strike Paragraphs 137 and 138 on hearsay grounds. (Resp. SMF ¶ 137, 138.)

probation revocation would be withdrawn and Garvey could be released from jail. (SMF ¶ 141; Resp. SMF ¶ 141.)

On November 16, 2006, Tracy Garvey received a phone call from Officer Foley of the Bangor Police Department. He told her that Garvey was being released and she should come pick him up. Tracy got out of work around 1:00 pm that day and went to pick up Garvey. When she picked him up he was very scared. He told her that he was afraid that they would make more stuff up, and send him back to jail. (SAMF ¶173.1; T. Garvey Aff. ¶18; Resp. SAMF ¶ 173.1.) [13]

On November 21, 2006, Burgess left a message on the telephone at the District Attorney's Office saying that he had William Garvey pointed out to him in person by a woman who knew both men and that he now believed Garvey was not the man who had robbed him. (SMF ¶ 142; Resp. SMF ¶ 142.)  To date, the robbery and assault crimes against Burgess have never been solved.  (SMF ¶ 143; Resp. SMF ¶ 143.)

According to Garvey, on Thanksgiving Day in 2006, around 10:00 am detectives came to the house and wanted to question William Garvey again. They said they had more strong evidence that he was involved. Both Garvey and Tracy stated it wasn't him. Shortly after that the Detectives left.  Both Tracy and William were extraordinarily upset. Tracy believes Garvey was so upset he called his counselor Richard Noonan. (SAMF ¶ 173.2;Garvey Aff. ¶ 19.) The defendants respond that Detectives Beaulieu and Cotton went to Tracy's house on this occasion because Mr. Garvey had left a phone message at the police station demanding the return of personal items that were still being held as part of their investigation. The detectives spoke

---

[13]     The defendants request that the representation by Tracy of what Garvey told his wife from jail be stricken on hearsay grounds as well as her characterization of his mental state as a medical diagnosis.  (Resp. SAMF ¶ 173.1)

briefly with Garvey about some additional information the District Attorney's office had received. (Resp. SAMF ¶ 173.2; Suppl. Beaulieu Aff. ¶ 5; Suppl. Cotton Aff. ¶ 5.)

Prior to these events, Garvey, Tracy, and her son were staying in the truck until October 23, 2006, when they received a visit from Officer Bill Lawrence who said he had received a report from the school that Tracy's son had said that they were all staying in the truck in the downtown parking lot. (SAMF ¶ 167; Resp. SAMF ¶ 167.) Because Garvey was homeless, he had parked his truck at the Pickering Garage and had a card key which recorded when he came and went from the garage. (SAMF ¶154; W. Garvey Aff. ¶ 6.) The Pickering Garage record reveals that Garvey's card key clocked in the inside entrance at 9:46 P.M. on October 19, 2006, and then through the roof top entrance where his vehicle was at 9:49 p.m. He did not leave the roof top exit until 4:47 a.m. on October 20, 2006. (SAMF ¶ 155; W. Garvey Aff. ¶ 7; id. Ex.1.)[14] Tracy confirms that Garvey was at the pick-up at around 9:45 and did not leave until the following morning. (SAMF ¶156; Resp SAMF ¶ 156.)

The only statement which Garvey is claiming slandered him is a statement by Detective Cotton in the presence of Garvey's wife and Gladys Swett, a public health nurse for the city, that he had "gay tendencies." (SMF ¶ 144; Resp. SMF ¶ 144; SAMF ¶ 168.)[15] When Garvey inquired of Gladys Swett about whether or not she believed he had gay tendencies she said she did not believe it. (SMF ¶ 145; Resp. SMF ¶ 145.) Garvey's wife did not believe he had gay tendencies. (SMF ¶ 146; Resp. SMF ¶ 146.) Garvey's wife and Gladys Swett are the only two

---

[14] The defendants deny that the parking garage card would specifically note when Mr. Garvey entered or exited the garage. The parking garage record that has been produced by Garvey shows an account in both William and Tracy Garvey's names and simply demonstrates that someone using a card belonging to that joint account entered or exited the garage at specific points, without identifying which account holder is using their card. (Resp. SAMF ¶¶ 154, 155; Suppl. Beaulieu Aff. ¶ 1; Suppl. Cotton Aff. ¶ 1.) They object to any evidence relating to the parking garage record and ask that it be stricken because no such record was ever produced prior to William Garvey's arrest. (Resp. SAMF ¶¶ 154, 155.)

[15] The defendants object to Garvey's reliance on Exhibit 2 to the Tracy Garvey Affidavit. This is an unsworn "To Whom it May Concern" letter by Swett. (Doc. No. 26-3.)

people to whom he claims this statement was made and both believed it was not true. (SMF ¶ 147; Resp. SMF ¶ 147.) Garvey concedes that his reputation was not harmed in the eyes of his wife and Ms. Swett by this statement because they knew it was not true.  (SMF ¶ 148; Resp. SMF ¶ 148.)

      Relying solely on Tracy's affidavit, Garvey propounds the following statements related to the impact of these events on his health and family life. After he was arrested on November 9, 2006, Tracy describes Garvey as becoming more depressed. He would stay up half the night. He was always afraid the detectives were coming to get him. He was prescribed Ritalin and OxyContin. It was clear to Tracy that he was so depressed.  Garvey became very irritable. (SAMF ¶ 174; T. Garvey Aff. ¶ 20; Resp. SAMF ¶ 174.)   After the arrest he changed; Tracy had never seen him like this before. His mood darkened and they began to argue more about why he would go out driving. She wanted him to stay home and he said he was afraid the police were going to come back and get him. (SAMF ¶ 175; T. Garvey Aff. ¶21; Resp. SAMF ¶ 175.)  He became frightened that he was going back to jail for four years and he threatened suicide. (SAMF ¶ 176; W. Garvey Aff. ¶¶ 18, 19; Resp. SAMF ¶176.)  In July of 2007 William's depression and irritability became too much for Tracy and she left him. (SAMF ¶177; Resp. SAMF ¶ 177.)  The officer's statements  - not specified by Garvey--  succeeded in causing a rift between Garvey and Tracy and were a significant factor in severely damaging their marriage. (SAMF ¶178; T. Garvey Aff. ¶ 23; W. Garvey Aff. ¶ 20; Resp. SAMF ¶ 178.)  As far as Tracy knows, Garvey apparently started taking drugs again, whereas, as far as she knows, he did not

take drugs when they were together before the arrest. (SAMF ¶179; T. Garvey Aff. ¶ 24; Resp. SAMF ¶ 179.)[16]

## C.    Claims

In his complaint Garvey sets forth six counts in addition to the now conceded municipal liability count:  False arrest; false imprisonment; intentional infliction of emotional distress; slander; "violation of civil rights under 42 U.S.C. § 1983" citing the Fourth, Fifth, and Fourteenth Amendments;  and violation of his civil rights under 5 M.R.S. § 4682.

In his memorandum responding to the defendants' motion Garvey argues, first, that the defendants have failed to produce admissible evidence in support of their motion for summary judgment.  I have discussed this dispute above and address it again below.  With regard to the defense of his legal claims, he addresses a Fourteenth Amendment due process ground claiming a want of probable cause for his arrest (Resp. Mot. Summ. J. at 8-9); articulates a "Constitutional Liberty Interest in Reputation" (id. at 9-10); defends against the defendants' assertion of a qualified immunity defense (Id. at 10); and, ever so briefly, parries in defense of his state law claims of false arrest and false imprisonment by asserting that there was no probable cause for his arrest and that a jury could conclude that the detectives acted in bad faith (id. at 10-11). Garvey also asserts that he is entitled to punitive damages because, in view of the concession that Cotton and Beaulieu were well trained and aware of the probable cause requirements, their arrest and detention of Garvey was reckless and callous vis-à-vis Garvey's federally protected rights. (Id. at 11-12.)

---

[16]    I agree with the defendants that Paragraph 180 of Garvey's statement of additional facts should be stricken as it is entirely premised on hearsay and the only materiality it has would be for the truth of the matter asserted. (See SAMF ¶ 180; Resp. SAMF ¶ 180.)

### 1.  Constitutional Claims Implicating Probable Cause and Qualified Immunity

Garvey does not dispute that the same question of whether or not there was probable cause for his arrest is the key concern with respect to his arrest related claims under 42 U.S.C. § 1983 and 5 M.R.S. § 4682.[17]  See Forbis v. City of Portland, 270 F.Supp.2d 57, 61 (D. Me. 2003) ("The disposition of the federal claim controls the plaintiff's claim under the Maine Civil Rights Act, 5 M.R.S.A. § 4682, because the latter is patterned on 42 U.S.C. § 1983."); see also Morelli v. Webster, 552 F.3d 12, 22 (1st Cir. 2009) ("[W]e conclude that the district court did not err in granting summary judgment on the unlawful detention claim (and, thus, on the mirror-image supplemental claim as well).").

"It is common ground that a warrantless arrest must be based on probable cause."  United States v. Brown, 500 F.3d 48, 56 (1st Cir. 2007) (citing United States v. Watson, 423 U.S. 411, 417-18(1976) and United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir.1987)).

> Proof of probable cause is not to be confused with the more onerous standard of proof of guilt beyond a reasonable doubt. See United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir.1999). Rather, probable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission. See United States v. Brown, 500 F.3d 48, 56 (1st Cir.2007); United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir.1987).

Morelli, 552 F.3d at 21.

With respect to Garvey's assertion that the defendants cannot rely on hearsay statements in defense of their probable cause conclusion, The United States Supreme Court explained in Draper v. United States:

---

[17]      The first subsection of Garvey's response memorandum addresses his no probable cause claim (Resp. Mot. Summ. J. at 4-8.)  Garvey also separates out a Fourteenth Amendment due process claim in his responsive memorandum which asserts that he was entitled to a judicial determination of probable cause following his arrest. (Id. at 8-9.)  However, Garvey has utterly failed to propound any facts in support of this theory.  On this record the court cannot infer that he did not have a probable cause hearing within forty-eight hours of his arrest.   There is not even a paragraph of Garvey's own affidavit that addresses this issue.  (See W. Garvey Aff. Doc. No. 26.)

Petitioner  …. contends (1) that the information given by Hereford to Marsh was "hearsay" and, because hearsay is not legally competent evidence in a criminal trial, could not legally have been considered, but should have been put out of mind, by Marsh in assessing whether he had "probable cause" and "reasonable grounds" to arrest petitioner without a warrant, and (2) that, even if hearsay could lawfully have been considered, Marsh's information should be held insufficient to show "probable cause" and "reasonable grounds" to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant.

Considering the first contention, we find petitioner entirely in error. Brinegar v. United States, 338 U.S. 160, 172-17, has settled the question the other way. There, in a similar situation, the convict contended "that the factors relating to inadmissibility of the evidence [for] *purposes of proving guilt at the trial,* deprive[d] the evidence as a whole of sufficiency to show probable cause for the search * * *." Id., 338 U.S. 172. (Emphasis added.) But this Court, rejecting that contention, said: "[T]he so-called distinction places a wholly unwarranted emphasis upon the criterion of admissibility in evidence, to prove the accused's guilt, of the facts relied upon to show probable cause. That emphasis, we think, goes much too far in confusing and disregarding the difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search. It approaches requiring (if it does not in practical effect require) proof sufficient to establish guilt in order to substantiate the existence of probable cause. There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them." 338 U.S. at pages 172-173.

358 U.S. 307, 311-12(1959) (footnote omitted).  See also Illinois v. Gates, 462 U.S. 213 (1983).

The fact that this a civil dispute in a summary judgment posture does not mean that the defendants have to somehow disavow the real premise of their probable cause determination and in some way generate a different factual basis for the arrest.  Indeed, Garvey recognizes that the information gathered by the detective from Burgess, Mouton, and Warner would probably be admissible at trial and states: "A Summary judgment motion must be decided on evidence, which would be admissible at trial. " (Resp. Mot. Summ. J. at 5.)  Counter to Garvey's assertion, the court does not discount this very material evidence in the guise of construing inferences in Garvey's favor as the nonmovant in a summary judgment dispute.

24

The following statement of facts summarizes the defendants' probable cause case.[18] Detectives Beaulieu and Cotton had been advised by Burgess that on the night of the robbery he had met the suspect at The Tavern and then proceeded from there to Hollywood Slots, where they remained until they were asked by security to leave.  (SMF ¶  112; Beaulieu Aff. ¶ 9; Cotton Aff. ¶ 8.) Detectives Beaulieu and Cotton concluded that the photograph that was obtained from Hollywood Slots security personnel showed the robbery suspect leaving the casino with Mr. Burgess. (SMF ¶ 113; Resp. SMF ¶ 113.) Officer Myron Warner, who knew Garvey and had spoken to him very recently, advised them after reviewing the Hollywood Slots photograph that he believed that William Garvey was the person in the photograph. (SMF ¶ 114;  Beaulieu Aff. ¶9; Cotton Aff. ¶ 8.) Detectives Beaulieu and Cotton confirmed with Cindy Moulton, the bartender at The Tavern, that the suspect shown in the Hollywood Slots photograph had been in The Tavern on the night of the robbery. (SMF ¶ 115; Resp. SMF ¶ 115.)   Wesley Burgess positively identified William Garvey from a photographic line-up as the person who had robbed him. (SMF ¶ 116; Resp. SMF ¶ 116.)  Garvey showed Detectives Beaulieu and Cotton his leather jacket, which matched the one the suspect was wearing in the Hollywood Slots photograph, including a pin that was worn in the same place or area on both jackets. (SMF ¶ 117; Beaulieu Aff. ¶ 9; Cotton Aff. ¶5.) [19] Garvey advised the detectives that he had been living in his vehicle in a parking garage that was a short distance from The Tavern, Hollywood Slots, and the scene of the assault and robbery, including being there on the night of the robbery. (SMF ¶ 118; Resp. SMF ¶ 118.)  Detectives Beaulieu and Cotton learned that Garvey had an extensive criminal

---

[18]     This is a handy excerpt of facts that are redundant of different, chronologically-oriented factual statements set forth above.  (See, e.g., SMF ¶¶ 82, 83, 84, 85, 87, 88, 89, 98, 99, 105, 106, 107, 108, 109; Resp. SMF ¶¶ 82, 83, 84,85, 86, 87, 88, 98, 99, 106, 109.)

[19]     Once again, I note that Garvey requests that the Court strike Paragraphs 112, 114, and 117 on the grounds that they are based on hearsay.  (Resp. SMF ¶¶ 112, 114, 117.)

record including multiple convictions for assault. (SMF ¶ 119; Resp. SMF ¶ 119.) Based on all the evidence Detectives Beaulieu and Cotton had obtained, they felt strongly that probable cause existed to believe Garvey had assaulted and robbed Burgess when Burgess refused to pay Garvey after he performed oral sex on Burgess. (SMF ¶ 120; Resp. SMF ¶ 120.)  I further note that the time that elapsed between the October 20 report of the assault and the November 9 arrest does not bespeak a rush to judgment or an over anxiousness to arrest any given suspect.

In terms of countervailing evidence the detectives had, there is no dispute that prior to the arrest Garvey denied ever going to Hollywood Slots, saying that it would be a violation of his probation.   When shown the Hollywood Slots photograph of the suspect, Garvey angrily denied that he was the person in the photograph and Garvey maintains that he told the officers that he could not be the individual he was seeking because he was homeless and sleeping in a truck. However, as earlier noted, Garvey has not placed any fact in this record that prior to his arrest (or during his detention) he provided the officers with the records from the garage purportedly documenting his presence in the garage during the relevant times.

Garvey has also created a factual dispute  - albeit flatly contested by the defendants – that Tracy looked at the picture of the suspect from the surveillance camera and indicated to the detectives that it was not Garvey, explaining that the individual in the photo appeared to have an indentation on his face and Garvey did not. They appeared to ignore what she said. Tracy continued to state that William wasn't the person in the picture.  According to Garvey, during the ride to collect Tracy's car in the immediate wake of the arrest, Detective Cotton continued to tell her that he thought she was lying, that Garvey hadn't been with her, and had committed a crime. She told him she didn't lie. Detective Cotton said if she lied, he would charge her with

26

committing a crime. Tracy repeated that she wasn't lying and that William, her son, and herself had been together, sleeping in Billy's truck on the night of October 19-20, 2006.

With respect to the liability of Detectives Cotton and Beaulieu for the continued detention of Garvey the record is that on November 15, 2006, the bartender at The Tavern, Cindy Moulton, viewed the same photo line-up as was shown to Burgess and Moulton identified Garvey as someone she knew.  It was at this point that Moulton further advised the detectives that Garvey had <u>not</u> been in The Tavern for some time because he had been banned from drinking at that establishment. Because Moulton had identified the suspect in the Hollywood Slots photograph as a person she had served at The Tavern on the night of the robbery, but then provided information that the suspect she had served was not Garvey, this information contradicted Burgess's identification of Garvey. Detectives Beaulieu and Cotton met with a prosecutor to provide him with this new information.  Because Garvey was being held on a probation violation as a result of his arrest, Detectives Beaulieu and Cotton contacted his probation officer with the new information as well, so the probation revocation would be withdrawn and Garvey could be released from jail.   On November 21, 2006, Burgess left a message on the telephone at the District Attorney's Office saying that he had William Garvey pointed out to him in person by a woman who knew both men and that he now believed William Garvey was not the man who had robbed him.

Based on this record and drawing all reasonable inferences in favor of Garvey - but certainly countenancing the portions of the detectives' affidavits that report on their investigatory interactions described by Garvey as impermissible hearsay – I conclude that Defendants Cotton and Beaulieu are entitled to summary judgment on an claim under 42 U.S.C. § 1983 or 15 M.R.S.  § 4682 that they violated Garvey's constitutional rights vis-à-vis his arrest and/or

detention. This conclusion makes my exploration of the heart of a qualified immunity analysis

unnecessary.[20]

### 1. Unconstitutional Harm to Reputation

As noted above, Garvey is less than clear in addressing which comments made by the

detectives were responsible for the damage to his reputation. What is evident is that he has not

advanced a claim that either defendant stated anything about the need for Tracy to get an AIDS

test.  The defendants are also correct in pointing out that the theory of a First Amendment claim

predicated on a right to intimate association is not pled in the complaint; as part of his 42 U.S.C.

§ 1983 count Garvey alleges:

> The Defendants in the course of investigating this claim, made false,
> defamatory, and stigmatizing statements about Garvey to his wife, with others
> present, alleging that he had gay tendencies and that his wife should get an aids
> test.  These statements deprived Garvey of a liberty interest in his good name and

---

[20]        With respect to the federal constitutional claims, these defendants assert an entitlement to qualified
immunity.  Regarding qualified immunity in this context, the First Circuit noted in  Morelli v. Webster:
>               The doctrinal intersection of qualified immunity principles and summary judgment
>       principles is not well mapped. Plotting that intersection can present thorny analytic problems-
>       problems that are magnified because of the desire to resolve claims of qualified immunity at the
>       earliest practicable stage of litigation. See Cox v. Hainey, 391 F.3d 25, 29 (1st Cir.2004)
>               The difficulty arises because the summary judgment standard requires absolute deference
>       to the nonmovant's factual assertions (as long as those assertions are put forward on personal
>       knowledge or otherwise documented by materials of evidentiary quality, see, e.g., Greenburg v.
>       P.R. Marit. Shipping Auth., 835 F.2d 932, 936 (1st Cir.1987)), whereas qualified immunity, when
>       raised on summary judgment, demands deference to the reasonable, if mistaken, actions of the
>       movant, see, e.g., Cox, 391 F.3d at 31. In order to ease this inherent tension, we think it wise for
>       courts to cabin these standards and keep them logically distinct, first identifying the version of
>       events that best comports with the summary judgment standard and then asking whether, given
>       that set of facts, a reasonable officer should have known that his actions were unlawful. See
>       Wilson v. City of Boston, 421 F.3d 45, 53 n. 10 (1st Cir.2005) (noting that genuine disputes anent
>       material facts must be resolved at trial even though qualified immunity is a question of law for the
>       judge); Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir.2002) (explaining that disputes as to material
>       facts sometimes will preclude summary judgment based on qualified immunity).
552 F.3d at 18 -19 (footnote omitted). See also  Comfort v. Town of Pittsfield, 924 F.Supp. 1219, 1236 (D. Me.
1996)("The Maine Civil Rights Act "was patterned after 42 U.S.C. § 1983," Grenier v. Kennebec County, 733
F.Supp. 455, 458 n. 6 (D.Me.1990), and employs the federal standard for qualified immunity, see Jenness v.
Nickerson, 637 A.2d 1152, 1155 (Me.1994)."). This summary judgment record apropos the dominating question of
whether or not the detectives had probable cause to arrest Garvey does not require the court to consider whether,
assuming there was not in fact probable cause for the arrest, the two detectives involved should have known that
their actions were unlawful.

> reputation with his wife and family was irreparably harmed by those statements all without due process of law.
>
> Defendants acted with malice and or with reckless and careless indifference to Garvey's constitutional due process rights in regards to his liberty, his reputation, and his marriage.

(Compl. ¶¶ 64,65.)  Garvey reiterates these two paragraphs in his 5 M.R.S. § 4682 count.

(Compl. ¶¶ 71, 72.) Garvey does not mention the First Amendment in his complaint.

Garvey's newly realized summary judgment theory is that he has a First Amendment interest in his intimate association and he and his wife are now in the midst of a divorce as a consequence of "the stigmatizing statement."  (Resp. Mot. Summ. J. at 9-10.)[21]  In terms of the facts before me, Garvey insists that Detective Cotton said that Tracy should be aware that Garvey has gay tendencies.   The defendants understandably object to this new theory on the grounds that a party cannot raise such a claim for the first time in response to a motion for summary judgment.  (Reply Mem. at 5.)  They also stress that Garvey admitted under oath that his wife did not believe this statement that Garvey had gay tendencies and Tracy confirmed this in her own affidavit. (Id. at 6.)   Tracy and Gladys Swett are the only two people to whom he claims this statement was made and both believed it was not true (see SMF ¶ 147; Resp. SMF ¶ 147) and Garvey concedes that his reputation was not harmed in the eyes of his wife and Ms. Swett by this statement because they knew it was not true (see SMF ¶ 148; Resp. SMF ¶ 148).

Indeed the facts are that the marital tension was caused by Garvey's depression related conduct after the arrest not Tracy's reaction to the alleged slander.  In July of 2007 William's depression and irritability became too much for Tracy and she left him. (See SAMF ¶177; Resp. SAMF ¶ 177.)  Garvey had been doing very well, keeping clean from drugs and had been clean

---

[21]      He relies on Struck v. Hackett, 668 A.2d 411, 418 (Me. 1995), a case that is not sufficiently on point to advance his claim.

since March of 2006 (see SAMF ¶158; Resp. SAMF ¶ 158) but Garvey apparently started taking

drugs again as a consequence of his arrest (see SAMF ¶179; T. Garvey Aff. ¶ 24; Resp. SAMF ¶

179).   After the arrest he changed; Tracy had never seen him like this before. His mood

darkened and they began to argue more about why he would go out driving. She wanted him to

stay home and he said he was afraid the police were going to come back and get him. (SAMF ¶

175; Resp. SAMF ¶ 175.)

### 2.   State Law Claims[22]

Garvey's defense of his state law claims – false arrest (Count I) and false imprisonment

(Count II)[23] –is perfunctory.  My conclusion that he has not created a genuine dispute of fact that

the defendants arrested him without probable cause leads to the same conclusion vis-à-vis his

false arrest claim.  See Richards v. Town of Eliot, 2001 ME 132, ¶ 31, 780 A.2d 281, 292 ("The

analysis of the state law claim[] of illegal arrest … is the same as for the federal law claims. As

we discussed above, a jury could not reasonably find that [the defendants] lacked probable cause

for Richards' arrest. Thus, the officers are entitled to summary judgment on a state law claim for

illegal arrest.");  compare McDermott v. Town of Windham, 204 F.Supp.2d 54, 70 (D. Me.

2002) ("[B]ecause the same nucleus of disputed facts are at issue in Plaintiff's claims for false

arrest and imprisonment as in her section 1983 claims for unlawful arrest, the Court will deny

---

[22]      As the Risk Manager for the City of Bangor, Wayne Seymour is familiar with insurance coverage that is procured by the City of Bangor that might provide coverage for claims arising out of the events of October 20, 2006, including Plaintiff's subsequent arrest on November 9, 2006.  (SMF ¶ 19; Resp. SMF ¶ 19.)  As a result of the City of Bangor's membership in the Maine Municipal Association Property & Casualty Pool, a self-insured municipal risk pool, the City of Bangor and its employees are entitled to coverage for state law claims only where there is no immunity provided by the Maine Tort Claims Act. (SMF ¶ 20; Resp. SMF ¶ 20.) The coverage available through the municipal pool is the only coverage available to the city and its employees for the state law claims presented by William Garvey in the instant litigation. (SMF ¶ 21; Resp. SMF ¶ 21.)

[23]      Garvey does not address his slander count (Count IV) or his intentional infliction of emotional distress claim (Count III) in his responsive memorandum. I conclude that he has abandoned these counts.  Although not a separate count, Garvey does defend his allegation of an entitlement to punitive damages apropos his 42 U.S.C. § 1983 claim.  (Resp. Mot. Summ. J. at 11-12.) My conclusion that his constitutional claims do not survive summary judgment moots this concern.

summary judgment to Defendant Cox on Plaintiff's claims for false imprisonment and false arrest."); see also Steeves v. City of Rockland, 600 F.Supp.2d 143, 183 -84 (D.Me. 2009) (discussing standard for false arrest claim under Maine law and concluding the claim did not survive summary judgment).  And, while the defendants have stated facts documenting their post-arrest investigative efforts leading to his release, for his part Garvey has set forth no facts pertaining to the post arrest, pre-release period of incarceration regarding the propriety of his being held.  As a consequence, the defendants are entitled to judgment on his false imprisonment claim. See, e.g., Steeves, 600 F. Supp. 2d at 184-85 (concluding that a false imprisonment claim failed under Maine law).

In his responsive memorandum Garvey simply reiterates that there is a genuine dispute as to whether or not the detectives had probable cause and speculates that if a jury were to conclude that they did not then it could conclude that the detectives acted in bad faith.  (Resp. Mot. Summ. J. at 10-11.)  This is, of course, an argument aimed at defeating the defendants' contention that they are entitled to immunity under the Maine Tort Claims Act per 18 U.S.C. § 8111(1)(C).  The defendants point out that the probable cause determination and the decision to arrest are inherently discretionary acts within the meaning of the act.  (Mot. Summ. J. at 12.)  See Blackstone v. Quirino, 309 F.Supp.2d 117, 130 (D. Me. 2004) ("The [Maine] Law Court's cases make it apparent that, as is the case with qualified immunity, discretionary function immunity protects police officers from civil liability for warrantless arrests in circumstances where the existence of probable cause is ambiguous."); see also supra note 20.  Garvey has simply failed to generate a dispute of fact from which this Court can infer bad faith on the part of either Detective Cotton or Detective Beaulieu in arresting Garvey and not taking any action vis-à-vis his detention until the time that they concluded that the evidence against him was questionable.

*Conclusion*

As explained above, my recommendation is that the Court grant the motion for summary judgment as to all claims against the Inhabitants of the City of Bangor, Detective Timothy Cotton, and Detective Brent Beaulieu.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 15, 2009